FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

03 JUL 14  AM 9: 59

U.S. DISTRICT COURT
N.D. OF ALABAMA

Gary Hammond and Michael          )
Whitten, on behalf of             )
themselves and others             )
similarly situated,               )
                                  )   CV-01-CO-811-NW
      Plaintiff(s),               )
                                  )
      vs.                         )
                                  )
Reynolds Metals Co., et al.,      )              ENTERED
                                  )
      Defendant(s).               )          JUL 1 4 2003

**************************************************************

Thomas L. Dawson, et al.          )
                                  )
      Plaintiff(s),               )   CV-01-CO-815-NW
                                  )
      vs.                         )
                                  )
Reynolds Metals Co.,              )
                                  )
      Defendant(s).               )


MEMORANDUM OF OPINION

I.   INTRODUCTION.

     Plaintiffs, Gary Hammond and Michael Whitten, in CA No.
CV-01-CV-J-811-NW (the "811 Action"), and Thomas Dawson and Jimmy
Reed, in CA No. CV-01-CV-B-815-NW (the "815 Action"), bring this
consolidated suit under ERISA, to represent a class consisting of
an undisclosed number of hourly employees formerly employed by
Reynolds at its Alloys Complex located in Colbert County, Alabama.
Plaintiffs contend that Reynolds deprived them of pension benefits
and supplemental unemployment benefits which they were entitled to



under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), pursuant to 29 U.S.C. § 1104, ERISA § 404, 29 U.S.C. 1105(a), ERISA § 405(a), and 29 U.S.C. § 1132, ERISA § 502(a)(1) and (a)(3) for breach of fiduciary duty and to enforce the terms of the ERISA plan . They also assert a claim under 29 U.S.C. § 1140 (§ 510) that both Reynolds and Wise Alloys LLC, combined to select the March 31, 1999 sale date for the Alloys Complex in order to interfere with Plaintiffs' ERISA rights. The claims have been briefed by both parties and, after due consideration the court finds that the motion is due to be GRANTED in part and DENIED in part.

II.  FACTS.

Until March 31, 1999, Reynolds operated several facilities in Colbert County, Alabama that produced coiled sheets of aluminum used primarily in the soft drink industry.  Collectively referred to as the Alloys Complex, these facilities were located in Muscle Shoals and Sheffield, Alabama.  Reynolds employed all four of the plaintiffs in the Alloys Plant, which was part of the Alloys Complex, until Reynolds sold the entire Complex to Wise Alloys LLC ("Wise") effective at midnight on March 31, 1999.[1]  Shortly before the sale, all four of the Plaintiffs applied for and accepted employment with Wise.

---

[1]Plaintiffs' dispute this fact to the extent it supports an argument that March 31, 1999 was the plaintiffs' last day worked for Reynolds.

As Reynolds employees, all four of the Plaintiffs were union members: Hammond and Whitten were members of the United Steelworkers of America, Local Union No. 200 ("USWA"); Dawson was a member of the Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 402 ("Teamsters"); and Reed was a member of the International Brotherhood of Electrical Workers, Local Union No. 558 ("IBEW"). The terms of employment applicable to Hammond and Whitten were reflected in the collective bargaining agreement between Reynolds and the USWA ("USWA CBA"). (Hammond Depo. 77, 95; Doc. # 72, Exhibit G; Whitten Depo. 98-99). Similarly, Dawson and Reed's terms of employment were reflected in the collective bargaining agreement between Reynolds and the North Alabama Building and Construction Trades Council ("BCTC"), which represented ten local unions at the Alloys Complex, including Teamsters Local 402, and IBEW Local 558 ("BCTC CBA"). (Dawson Depo. 28-29; Doc. #72, Exhibit H, p. 39; Reed Depo. 27-29).

As part of the terms of their employment, Reynolds' provided all hourly employees with certain employee benefits. The terms for these employee benefits were set forth in a document called "Reynolds Hourly Employees - Benefits and Pay: Your Total Compensation." (Dawson Depo. 26-27; Hammond Depo. 33-34; Reed Depo. 24-25; Whitten Depo. 32-33). Appearing in a green covered binder, employees referred to it as the "Green Book" or "Total Compensation Binder" (hereinafter the "Green Book"). (*Id.*).

Plaintiffs all have their own copy of, or access to, the Green Book. (Dawson Depo. 26; Hammond Depo. 55; Reed Depo. 24-25; Whitten Depo. 32-33).

The Green Book contains the pension plan that is at issue in this action. This plan, called "The Reynolds Metals Pension Plan for Hourly Employees," is a defined benefit pension plan sponsored and administered by Reynolds (hereinafter the "Pension Plan"). The Pension Plan is maintained pursuant to collective bargaining agreements between Reynolds and the various bargaining units representing employees at the facilities, including the USWA, the Teamsters, and the IBEW. (Hammond Depo. 32-34, 77, 95; Doc. #72, Exhibit G, Art. XXII, Section 3, at 27; Dawson Depo. 26-29;Doc. #72, Exhibit H, Art. IX, Section 1 at 14; see also Reed Depo. 57-58; Whitten Depo. 34).

The Pension Plan consists of three general categories of hourly pensions: traditional pensions, special early retirement pensions, and a disability pension. (Doc. #72, Exhibit I, sub tab 3 at 6-8, 25-27). While employees are typically eligible for "traditional" pensions upon attaining age 60 or older,[2] there are other occasions, usually resulting from causes beyond an employee's control, where pensions can be paid immediately. (Doc. #72, Exhibit I, sub tab 3 at 7, 26). These "special early retirement"

---

[2] This category of pensions includes the 65/5 or Normal Retirement, the 62/10 Retirement, the 60/10 Retirement, and the 30-Year Retirement. (Doc. #72, Exhibit I, sub tab 3 at 6, 25).

pensions include the 70/80 Special Pension, the Rule of 65 Pension, and the 55/10 Special Pension. (Doc. #72, Exhibit I, sub tab 3 at 7, 26).

Regardless of the pension at issue, Pension Plan benefits are not paid automatically;[3] an employee or former employee must apply for them in writing before his or her intended retirement date. (Doc. #72, Exhibit I, sub tab 3 at 17-18, 27). If a pension application is denied in whole or in part, the employee will receive a written notice of the denial within 90 days after receipt of his or her application. (Doc. #72, Exhibit I, sub tab 3 at 17-18, 27). Upon receipt of the denial notice, an applicant may file an appeal to an Appeals Board. (Doc. #72, Exhibit I, sub tab 3 at 17-18, 37). This Board is composed of three members: one appointed by the union, one by Reynolds, and one by mutual agreement of the union and Reynolds members. Following a hearing in which the parties' representatives may provide comments and/or suggestions, a majority of the Appeals Board shall make a final decision that shall be binding on Reynolds, the union, and the employee.

Both the collective bargaining agreements between Reynolds and the USWA, and between Reynolds and the BCTC, contain grievance and arbitration procedures. The USWA contract requires a grieving employee and the employee's shop steward to first speak with the

---

[3]Plaintiffs' indicate that they do not know whether the defendant acually followed these procedures.

employee's supervisor, then to the employee's departmental superintendent or his designated representative.   (Hammond Depo. 77, 95, Doc. # 72, Exhibit G at p. 23, Art. XV, Sections 1-2).

If the grievance is not resolved, the employee may then reduce the alleged grievance to writing, setting forth the facts in the case.   (*Id.*).  The written grievance may be signed by the aggrieved employee and/or his union shop steward.   (*Id.*).  The employee will then provide the original and first copy to the department superintendent, with the union retaining the second and third copies.   (*Id.*).  If unresolved at that point, the Union shall take up the grievance on behalf of the employee and, barring resolution, may ultimately take the grievance to arbitration.   (Doc. #72, Exhibit G at p. 23, Section 3-6).

Similarly, the BCTC contract requires a grieving employee, with or through his job steward, to first discuss a grievance with the employee's foreman.   (Dawson Depo. 29; Doc. #72, Exhibit H at p. 23, Section 2).  Then, if the grievance is not resolved, the employee and/or job steward must immediately reduce the grievance to writing and present it to the employee's department head or designated assistant.   (*Id.* at 24, Section 3).  If unresolved at that point, the applicable union may present the grievance to the personnel manager and, if still unresolved, the BCTC may take the grievance to the Director of Industrial Relations and then, if

necessary, to arbitration. (Doc. #72, Exhibit H at 24, Section 4-7).

A.   Plaintiff's Pension Credit Claims

Plaintiffs allege, in part, that Reynolds deprived them of pension service credit. (Complaint ¶¶ 30, 38-39). In this respect, although service credit is generally expressed in the Pension Plan in terms of years, an employee's Pension Plan benefits are figured on the basis of calendar quarters of service (i.e., January-March, April-June, July-September, October- December). (Doc. #72, Exhibit I, sub tab 3 at 7, 26). Employees may be credited with years of pension service based on the receipt of wages, disability benefits, workers compensation benefits, unemployment compensation benefits, serving on full-time military duty, or during leaves of absence to conduct union business. (Doc. #72, Exhibit I, sub tab 3 at 16, 34). Employees may also receive up to eight calendar quarters of pension service due to absence because of accident, sickness, or layoff (including layoff due to shutdown of plant, department or a substantial portion thereof). (Doc. #72, Exhibit I, sub tab 3 at 16, 34). Based on this provision, all four Plaintiffs continued to earn up to two years (8 quarters) of pension service credit after the sale of the Alloys Complex on March 31, 1999.

While all of the Plaintiffs' pension claims relate to their objections to how Reynolds calculated their pension service credit, there are differences among their respective theories. For

example, as of the March 31, 1999 sale date, Hammond and Whitten were one pension service quarter shy of the 80 quarters necessary to qualify for a Rule of 65 Pension. (Hammond Depo. 136-137; Doc. #72, Exhibit K; Whitten Depo. 142; Doc. #72, Exhibit L).

     1.   *Hammond and Whitten's Claims for Pension Benefits*

Hammond and Whitten generally argue that, had Reynolds sold the Alloys Complex to Wise after April 1, 1999, or had Hammond and Whitten performed services for Reynolds in the second quarter of 1999, they would have earned an additional quarter of service and would have been immediately eligible to receive a special early retirement (i.e., Rule of 65 Pension). (Hammond Depo. 87; Whitten Depo. 48).

Recognizing their proximity to a Rule of 65 Pension, Hammond and Whitten approached a Reynolds' human resources representative, Caroline West, shortly before March 31, 1999 to request a transfer to another Reynolds' facility so that they might be able to accrue the additional service time necessary for special early retirement eligibility. (Hammond Depo. 57-59; Whitten Depo. 40). In response, Ms. West told them they could not file a transfer request as no one from the Colbert County Facilities would be transferred to another Reynolds facility. (Hammond Depo. 58-59; Whitten Depo. 40). Hammond and Whitten then asked Ms. West about applying for a pension. (Hammond Depo. 59-60; Whitten Depo. 40). West then had an employee check their records and informed them that neither were

eligible for a special early retirement as of March 31, 1999. (Hammond Depo. 60-61; Whitten Depo. 40-41). She told them she could not give them the forms to apply for the pension because they were not eligible. (Hammond Depo. 57; Whitten Deop. 40). Thereafter, Hammond and Whitten contacted the USWA about their pension claims, and were told that the union had pursued this issue on another occasion and lost, and so it would not proceed with their claim. (Hammond Depo. 68; Whitten Depo. 47-50). Hammond then consulted his Green Book to determine the next appropriate procedural step. Because he did not believe that the company was following the procedures as set forth in the Green Book, he believed his only options were to seek counsel or to file a lawsuit. (Hammond Depo. 127). Whitten also believed that after exhausting the procedures he had the right to file a lawsuit. (Whitten Depo. 41-42). Prior to consulting with an attorney, however, Whitten wrote a letter to the Reynolds Office in Richmond, Virginia to request the additional quarter of 1999 and his Rule 65 benefits. (Whitten Depo. 46; Doc. #79, Exhibit H). Robert Cohen responded on behalf of Reynolds and informed Whitten that he was not eligible for immediate retirement and would be vested for the regular pension plan. (*Id.*). Cohen's letter made no mention of Whitten's right to appeal or of any other steps that Whitten could take to apply for benefits. (*Id.*). Hammond and Whitten subsequently contacted an attorney in early

2000 regarding their pension claims.   (Hammond Depo. 31, 78; Whitten Depo. 52, 59-60, 71, 102).

        2.   *Dawson's Claims for Pension Benefits*

On March 31, 1999, Dawson had already satisfied the age and service requirements for a Rule of 65 Pension.   (Dawson Depo. 69; Doc. #72, Exhibit M).   However, because of the two year layoff requirement under a Rule of 65 Pension, he could not elect to retire until March 31, 2001.   (*Id.*).

Dawson thereafter applied for and accepted employment with Wise (Dawson Depo. 118, 128-129) and began to accrue additional quarters of service from Reynolds under the Pension Plan's layoff provisions.   Ultimately, Dawson accrued an additional 6 quarters of pension service credit and "grew into" eligibility for a 70/80 Pension, which is a more valuable pension option.   (Dawson Depo. 48-49).   Thereafter, in September 2000 Dawson applied for this 70/80 Pension and, in October 2000, began receiving his pension benefits.   (Dawson Depo. 48-51).

Dawson contends that Reynolds violated his pension rights when it credited him with the second quarter of 1999 based on the Pension Plan's layoff provisions, versus crediting him with this quarter based on wages allegedly earned from Reynolds.   (Dawson Depo. 78-79).   Moreover, he contends that he should have begun to receive his 70/80 Pension on his 52nd birthday (August 12, 2000),

versus the end of the third quarter of 2000, when Reynolds ultimately credited him with this quarter. (Dawson Depo. 80).

Dawson also alleges that he told his union representatives about his predicament, but that, while they said they would investigate, nothing came of it. (Dawson Depo. 95-96). Dawson claims that he then sought legal counsel in the latter part of 1999. (Dawson Depo. 141). However, Dawson did not file an administrative appeal under the Pension Plan, nor did he file a written grievance under the terms of his union contract. (Dawson Depo. 101-102).

### 3. Reed's Claims for Pension Benefits

Similar to Hammond and Whitten, Reed was also short of the necessary quarters for Rule of 65 Pension eligibility. (Reed Depo. 30-33). Upon learning of his ineligibility for a Rule of 65 Pension, Reed contacted the IBEW, which then initiated an effort on Reed's behalf to obtain pension benefits. (Reed Depo. 33). The Union initially argued that Reed was "entitled to add the quarter of April, May and June of 1999 to his retirement accumulation" because he was on vacation during the week of the sale, and was not scheduled to return to work until April 4, 1999." (Reed Depo. 38; Doc. #72, Exhibit N). Later, however, based on the request of the Union, Reynolds performed a complete review of Reed's employment history and discovered that Reed had only 77 quarters of pension

service as of March 31, 1999.  (Reed Depo. 40-43; Doc. #72, Exhibit
O; Doc. #72, Exhibit P).[4]

Thereafter, the IBEW took issue with Reynolds' calculation of
Reed's pension history, arguing, first, that Reed deserved credit
for the second quarter of 1999 because he was on vacation through
April 4, 1999; and second, that Reed had been laid off for a period
of about seven months from June 1980 to February 1981, but that
Reynolds had incorrectly categorized Reed's separation from
employment at that time as a termination.  (Reed Depo. 45-59; Doc.
#72, Exhibit Q; Doc. #72, Exhibit R).  This latter contention was
significant because, had Reed been laid off and not terminated, he
would have received pension service credit for two quarters.
(Id.).  Thus, if successful on both arguments, Reed would receive
three additional quarters of pension service, and would be eligible
for a Rule of 65 Retirement immediately. (Id.).

Reynolds, however, disagreed.  As to the IBEW's vacation
argument, Reynolds maintained that, for Reed to have qualified for
a Rule of 65 Pension, he must have had 20 years (i.e., 80 quarters)
of service as of his Last Day Worked, as indicated in the Pension
Plan.  (Reed Depo. 39; Doc. #72, Exhibit N).  Since the Alloys
Complex was sold on March 31, 1999, Reed could not have had 20
years of service as of his Last Day Worked for Reynolds.  (Id.)

---

[4]The court notes that Reed claims he had 79 quarters (Depo. of Reed, p. 32).

Unable to resolve their differences, Reynolds and the IBEW conducted an arbitration of Reed's pension claim.   (Reed Depo. 49-51; Doc. #72, Exhibit S; Doc. #72, Exhibit T).   On July 22, 2002, the arbitrator issued an opinion in which he denied Reed's grievance in its entirety.   (Reed Depo. 53; Doc. #72, Exhibit T). The arbitrator found, first, that Reed had been terminated in June 1980, and therefore properly did not receive pension service credit for that period; and second, that Reed's last day of work was March 31, 1999 - thus, he could not receive pension service credit for the second quarter of 1999.(Id.)   Notably, Reed's claims before the arbitration panel did not include a claim for intentional interference under ERISA § 510 or breach of a fiduciary duty under § 502.

B.   Claims for Supplemental Unemployment Benefits ("SUB")

Plaintiffs also claim that Reynolds denied them supplemental unemployment benefits.   The Green Book contains the terms of the Reynolds Supplemental Unemployment Benefit Plan ("SUB Plan"), which is a group welfare plan providing layoff and short-week benefits to eligible employees.   (Doc. #72, Exhibit I, sub tab 4).

The purpose of the SUB Plan is to provide income during certain periods of layoff and reduced hours.   (Doc. #72, Exhibit I, sub tab 4 at 4).   Like the Pension Plan, the SUB Plan is maintained pursuant to collective bargaining agreements between Reynolds and the various bargaining units representing employees at the Alloys

Complex, including the USWA, the Teamsters, and the IBEW. (Hammond Depo. 32-34, 77, 95; Doc. #72, Exhibit G, Art. XXII, Section 3 at 27; Dawson Depo. 26-29; Doc. #72, Exhibit H, Art. IX, Section 1 at 14).

After application, if an hourly employee disagrees with Reynolds' decision related to SUB payments, the Plan also provides an appeals procedure:

> If you disagree with the decision relating to Plan benefit - such as eligibility for or amount of payment - you should first discuss the matter with the Company representative responsible for benefit applications at your location. If after talking with a representative you feel the disagreement is not resolved, you may file a written SUB grievance on a form available from your Human Resources Office. The grievance must be filed within 30 days of the discussion. If you do not file a grievance within 30 days, the decision will be considered final. If you dispute benefits for more than one week, you must continue to report and make application as required to maintain your eligibility for the weeks in question.

*Id.* at 10.

Plaintiffs testified that Reynolds told them prior to the plant sale that they were not eligible for SUB. (Dawson Depo. 98-101; Reed 64-65; Whitten Depo. 77-79). Relying on this alleged statement in conjunction with the fact that they received a one dollar an hour pay reduction and less generous benefits with Wise than with Reynolds, Plaintiffs appear to contend that they should have been permitted to choose whether to work for Wise or,

instead, to accept layoff from Reynolds and apply for supplemental unemployment benefits (which could have provided them with additional credits toward an early pension). (Dawson Depo. 113-118; Hammond Depo. 106-107; Reed Depo. 78-79; Whitten Depo. 22, 77-78). Because Reynolds' stance (that they were not eligible for SUB) did not allow for this choice, Plaintiffs allege an ERISA violation.

Based on these allegations, each of the Plaintiffs allege that they approached their respective union representatives regarding their SUB claims, but no action was taken. For example, Hammond and Whitten assert that the USWA was unsure about what it was going to do about SUB pay (Hammond Depo. 103-105; Whitten Depo. 81, 85); Dawson claims that his Teamsters representatives told him that they would investigate (Dawson Depo. 121-122); and Reed alleges that the IBEW told him that "someone else" was handling issues regarding SUB. (Reed Depo. 87-88). Despite these efforts, none of the Plaintiffs filed a claim for SUB pay, and none of the four Plaintiffs pursued an administrative appeal or filed a written union grievance regarding their SUB claims. (Dawson Depo. 117-118; Hammond Depo. 103, 114: Reed Depo. 70-71, 86-88; Whitten Depo. 80, 85; Doc. #72, Exhibit J at Int. No. 21). As with the claims for benefits under the Pension Plan, however, the plaintiffs believed that they could choose either to pursue administrative remedies or to file suit in federal court.

C.   Claims for Interference with Applying for ERISA Benefits

Finally, the Plaintiffs argue that Reynolds and Wise selected the March 31, 1999 sale date in order to interfere with their ERISA rights.   In support of this assertion, Plaintiffs allege that the March 31, 1999 closing date occurred on a Wednesday instead of a Sunday - i.e., the end of Reynolds' traditional work week.  (Dawson Depo. 123; Reed Depo. 92-93).  Moreover, Plaintiffs also allege that there exists a large number of Reynolds employees whose pension benefits were affected because the sale did not occur after April 1, 1999 - i.e., in the second quarter of 1999. (Dawson Depo. 126-127; Hammond Depo. 173-174; Reed Depo. 94-95; Whitten Depo. 127-128).  None of the parties filed a written grievance, or otherwise pursued their administrative remedies, as to this interference claim.   (Dawson Depo. 30-32; Hammond Depo. 78; Reed Depo. 24; Whitten Depo. 52, 59-60, 85, 102).

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

III. DISCUSSION.

Plaintiffs' claims turn on two entitlements: (1) under ERISA § 502 for breach of fiduciary duty and to enforce the terms of the

plan benefits (including retiree health benefits and for SUB benefits) and (2) under ERISA § 510 for interference with  with exercising their ERISA statutory rights. Plaintiffs state the reasons for those denials are common to Plaintiffs and their class. The court will address each claim in turn.

A.   ERISA § 502 Claims for Pension and SUB Benefits

Although the ERISA statute itself does not specifically require that a participant or beneficiary exhaust a plan's internal review procedures before a lawsuit can be filed, numerous courts (including the Eleventh Circuit) have read an exhaustion requirement of administrative remedies into the statute. *Watts v. Bellsouth Telecommunications, Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003); *Perrino v. Southern Bell Telephone &* Telegraph, 209 F.3d 1309, 1315-16 (11th Cir. 2000); *Curry v. Contract Fabricators, Inc.* 891 F.2d 842, 846 (11th Cir. 1990). Courts require plaintiffs to exhaust their administrative remedies in an effort to: reduce the number of frivolous lawsuits under ERISA; promote the consistent treatment of claims for benefits; provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned. *Watts* 316 F.3d at 1209 (11th Cir. 2003) (quoting *Curry*, 891 F.2d at 846). However, parties can only be encouraged to use administrative remedies if the plan contains clear language conveying the importance of doing so.   *Id*. Exceptions to the exhaustion requirement may also be

found if the court finds that "administrative remedies would be futile or the remedy inadequate," *Perrino*, 209 F.3d at 1316 (quoting *Counts v. Amer. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)), or where a claimant is denied "meaningful access" to the administrative review scheme in place, *Curry*, 891 F.2d at 846-47.

The plaintiffs' admit that they did not exhaust their administrative remedies, but contend that the requirement should be excused because, from reading the plan language, they reasonably believed that they had several options to choose from—either to pursue their claim in federal court, or to continue with the administrative review process. The Eleventh Circuit recently addressed the issue in *Watts v. Bellsouth Telecommunications, Inc.*, 316 F.3d 1203, 1208-08 (11th Cir. 2003). In that case, the plaintiff filed a claim for disability benefits and was denied. After the claim was denied, she consulted her union representative and re-read the plan provisions. She then concluded that she could pursue her claim administratively, in court, or both. Sixteen days after the appeal expired, she hired counsel, and, that same day, filed her second appeal which the defendant denied as untimely. On these facts, the court held that a "claim ought not to be barred by the doctrine of exhaustion if the reason the claimant failed to exhaust is that she reasonably believed, based on what the summary plan description said, that she was not

required to exhaust her administrative remedies before filing a lawsuit." *Id*. at 1206.

The *Watts* court focused primarily on whether the interpretation of the summary plan was reasonable. It noted "[t]he reasonableness of it must be judged from the perspective of the average plan participant." *Id*. at 1207. The court also cited to an analogous case which pointed out that any discrepancies in the plan should be construed against the drafter. *Id*. at 1208 (citing (*Lee v. Blue Cross/Blue Shield of Ala*., 10 F.3d 1547, 1551 (11th Cir. 1994). In deciding the participant read the plan in a reasonable manner, the court held that although the error amounted to a "simple drafting error" it believed that its ruling would encourage the clearer drafting of ERISA policies. In a footnote (which is also applicable in this case) the court reminded the employer that they also could have called attention to the availability of administrative remedies in the denial letter. *Id*. at 1208 n.2.

The defendant argues that the cases are distinguishable because: (1) Watts actually pursued administrative remedies, whereas three of the plaintiff here never pursued them at all, and (2) Watts did not retain counsel until after her appeal rights had expired, whereas Hammond and Whitten retained counsel within days after Whitten received Reynolds' January 2000 letter, and Dawson retained counsel in late 1999 (Dawson Dep. 141); (3) Furthermore,

after having retained counsel, Watts at least attempted to exhaust the administrative requirements by immediately filing another administrative appeal, whereas in this case the plaintiffs did not exercise the appeal rights until they filed the instant lawsuit.

Reynolds' employee benefit plan and SPD contain the exact language used in the *Watts* plan.  Like BellSouth, Reynolds used the following language directly from the Secretary of Labor and included that language in its plan: "If you have a claim for benefits denied or ignored, in whole or in part, you may file suit in state or federal court." C.F.R. § 2520.102-3(t), (t)(2).  Like the Bellsouth plan, the defendant's plan stated that an employee "may file" a written SUB grievance, and "may file" an appeal of a denial of pension benefits. (Doc. #79, Exh. A "Key Events" pp. 20-21; "Supplemental Unemployment" p. 25; "Retirement" p. 17). As with the Bellsouth plan, the defendant's plan does not say that an appeal or grievance is necessary before filing a lawsuit.  The requirements appear to be: (1) pension benefits must be applied for in writing, with the appropriate forms available in the Human Resources Office and (2) if a SUB grievance is not filed, the defendant's decision is binding. (Doc. #79, Exh. A "Key Events" pp. 20-21; "Supplemental Unemployment" p. 25; "Retirement" p. 17) Neither of these requirements definitively indicate that a grievance or appeal is required before a lawsuit may be filed.

Moreover, like the plaintiff in *Watts*, the plaintiffs have provided evidence that they found the policy language confusing and the policy language is almost identical to that in the case at bar. Despite the fact that Reed is the only plaintiff who pursued arbitration, the *Watts* holding is still applicable to his claim because he could have reasonably concluded that he had the option to file suit in federal court.

In conclusion, the court denies summary judgment on the plaintiff's § 502 claims because the plaintiffs' could have reasonbly concluded from the plan langugage that they were not required to exhaust their administrative remedies.

B.    Interference with ERISA Rights pursuant to § 510

The plaintiffs' next bring a cause of action under § 510. They contend that the timing of the sale of the Lister Hill plant was intended to prevent the attainment of the special early retirement pensions for the entire class of employees who would become eligible for a special retirement pension in the second quarter of 1999. Section 510 prohibits anyone from interfering with the attainment of any rights to which a person may become entitled under the provisions of an employee benefit plan that falls within the coverage of ERISA. *Amaro v. Continental Can Co.*, 724 F.2d 747, 749 (9th Cir. 1984). Unlike the claims addressed in the previous section, section 510 rights are statutory and are created independent of any collectively bargained rights. *Id.*

(citing *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238, 1242-43 (7th Cir. 1983)). Some courts have held that because the issue is one of statutory construction, the expertise available at the plan level would be of little use and have not required the plaintiffs to exhaust their administrative remedies. *See, e.g. Gavalik v. Continental Can*, 812 F.2d 834, (3rd Cir. 1987); *Amaro v. Continental Can*, 724 F.2d 747 (9th Cir. 1984). While others, including those in this circuit, have held that exhaustion of administrative remedies is required to further the goals of informal dispute resolution and to reduce frivolous lawsuits. *See Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1226-27(11th Cir. 1985); *Byrd v. MacPapers, Inc.*, 961 F.2d 157, 160-61 (11th Cir. 1992); *see also Perrino v. Southern Bell Telephone & Telegraph*, 209 F.3d 1309, 1316 n.6 (11th Cir. 2000) (noting that there is a circuit split on the issue but also noting that the Eleventh Circuit applies the exhaustion requirement).[5]

In this case, the plaintiffs urge the court not to apply the exhaustion requirements due to the circuit split. The existence of a circuit split is not helpful to their cause where the

---

[5]It is unclear whether the same exceptions to the exhaustion requirement apply when the claims is under § 510. The holding in *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842 (11th Cir. 1990) appears to indicate that the exceptions to the exhaustion requirement apply whether the claim is statutory or made under the plan. Outside of the futility argument, however, the plaintiffs did not raise any additional applicable exceptions to the exhaustion requirement. Moreover, the court finds that the *Watts* holding would not help the plaintiffs in this case where they never even attempted to avail themselves of administrative procedures.

Eleventh Circuit has ruled clearly on the side of exhaustion.  The plaintiffs acknowledge that they never raised or mentioned the issue of interference at the administrative level, nor did they file a grievance with their union.  The plaintiff's raise one other argument, they maintain: "Reynolds states that Plaintiffs have received all the benefits due them.  It follows, *a fortiori*, that Reynolds would not concede during an administrative review that it intentionally interfered with Plaintiffs' rights to those benefits for which Reynolds claims they were never eligible.  This evidences the complete futility of administrative review." (Plaintiffs' Response Brief at 18).

Again, although the Eleventh Circuit has not addressed whether the futility argument applies to § 510 claims, the court  is not convinced that the plaintiffs could prove that exercising their administrative remedies would indeed be futile.  Under the futility exception, the district court may excuse the exhaustion requirement when administrative remedies are unavailable, would be futile, or where the remedy would be inadequate.   *Perrino*, 209 F.3d at 1318.  The plaintiff must make a clear and positive showing of futility before the court may suspend the exhaustion requirement. *Springer v. Wal-Mart Associates Group Health Plan*, 908 F.2d 897, 899 (11th Cir. 1990).  In this respect, the futility exception is limited to those instances where resort to administrative remedies would be clearly useless. *Stepenson v. Provident Life & Accident*

*Ins. Co.*, 1 F. Supp. 2d 1326, 1331 (M.D. Ala. 1998) (citing *McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253 (10th Cir. 1998)). The test for futility is not whether the employees' claims would succeed, but whether the employees could have availed themselves of the grievance procedure. *Foster v. Cordis Corp.*, 707 F. Supp. 517 (S.D. Fla. 1988) (citation omitted); *see also Communication Workers of Amer. v. AT&T Corp.*, 40 F.3d 426, 432-33 (D.C. Cir. 1994) (holding that despite the fact that an unfavorable administrative decision might be "highly unlikely" futility was not present because the final review authority "never had the opportunity to render a final determination"); *Springer*, 908 F.2d at 901 (finding administrative remedies not futile even where plan administrator who makes initial decisions and trustees who review appeals, share common interests otherwise exhaustion requirement would be excused in virtually every case).

The plaintiffs, however, have not demonstrated how pursuing this particular grievance would have been an "empty exercise in legal formalism," particularly when the union plans allowed for binding arbitration. *Perrino v. Southern Bell Telephone and Telephone & Telegraph*, 209 F.3d 1309, 1317 (11th Cir. 2000). Like the plaintiffs in *Perrino*, the plaintiffs were all former unionized employees whose CBA entitled them to certain benefits which are also governed by ERISA. *Id.* at 1312. In affirming the district court's entry of summary judgment, the court held that the

plaintiffs were obligated to exhaust administrative remedies before bringing an action in federal court. *Id.* Despite the plaintiffs' contention that their union impeded their pursuit of the grievance and arbitration procedure, the plaintiffs had never actually resorted to those procedures, so the court held that the plaintiffs' could not be thwarted in that respect. *Id.* at 1317. The court summarized stating "[i]f a reasonable administrative scheme is available to a plaintiff and offers the potential for an adequate legal remedy, then a plaintiff must first exhaust the administrative scheme before filing a federal suit." *Id.* at 1318. Here, the grievance and arbitration procedure was available to the plaintiffs and they did avail themselves of it.

Accordingly, summary judgment is granted on the plaintiffs' § 510 claims for failure to exhaust their administrative remedies.

IV. CONCLUSION.

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ____ of July, 2003.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE